UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| JOSE REYES, *as Personal Representative for the Estate of Bobby Reyes*, and<br>SARAH JONES,<br><br>      Plaintiffs,<br><br>v.<br><br>MONROE COUNTY and<br>SONYA SAMPSEL,<br><br>      Defendants. | Case No. 20-11937<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER
GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [16]**

The facts of this case are tragic. Except for asthma, Bobby Reyes was a healthy teenager. And Reyes' asthma was well controlled by his inhaler. But in September 2019, Reyes suffered an asthma attack that his inhaler could not stop. Reyes' mother, Sarah Jones, believed that emergency medical services were available at a nearby fire station, and so she rushed Reyes there. Unknown to Jones, the station was for a volunteer fire department, and no one was there when she arrived. By this point, Reyes was no longer breathing. As an additional measure, Jones had called 9-1-1 on her way to the fire station. But this also ran into a problem: Sonya Sampsel, the dispatcher, had incorrectly entered a firefighter's *association* into the dispatch system instead of the fire *station* where Jones and Reyes were located. Although both of Jones' efforts to get help for Reyes had not gone as expected, a firefighter happened

upon Jones and Reyes in relatively short order. But he could not get Reyes to breathe. And for reasons seemingly unrelated to the incorrect location being put in the system, an ambulance would not arrive on scene until about 16 minutes after Jones had dialed 9-1-1. By the time ambulance personnel got Reyes' heart to restart, Reyes had suffered severe brain damage. He ultimately died.

In time, Jones along with Reyes' father, Jose Reyes, filed this lawsuit against Sampsel and Monroe County. Plaintiffs pursue a "state-created-danger theory" under the federal Constitution and negligence theories under state law. Defendants ask this Court to grant them summary judgment.

As explained in detail below, for Plaintiffs to prevail on their state-created-danger claim, they must show that Sampsel was at least reckless—proof that she was negligent is not enough. Yet the evidence shows that Sampsel did not act with the required recklessness. So Plaintiffs' state-created-danger theory cannot proceed to a jury. *See Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 928 (6th Cir. 2020) ("Like other cases involving the 'state-created-danger' theory[,] . . . this case comes to us with tragic facts. . . . [But] the Constitution does not empower federal judges to remedy every situation we find heart-wrenching.").

As for the state-law claims, Michigan's Governmental Tort Liability Act shields government actors like Sampsel from claims of negligence unless they were "so reckless as to demonstrate a substantial lack of concern for whether an injury results." So Plaintiffs' state-law claims fail for the same reasons that their federal claim fails: there is no evidence that Sampsel was reckless.

Defendants will thus be granted summary judgment.

I.

A.

Given audio records and dispatch logs, hardly any facts can be reasonably disputed. But because Sampsel seeks summary judgment, where reasonable disagreement does exist, the Court will accept Reyes and Jones' version of the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Ash Township is a small town located about 30 miles southwest of Detroit, Michigan. The township has two fire stations that go by "Station 1" and "Station 2." (*See* ECF No. 16-4, PageID.258.) Station 2 is located on Ready Road (ECF No. 16-5, PageID.305), and, for this opinion, it is helpful to call it the "Ready Road Station." In addition to the two fire stations, there is something called the "Ash Township Fire Fighters Association" located on Horan Street. (ECF No. 16-4, PageID.263; ECF No. 16-5, PageID.308.) Because the documentary evidence calls this the "firemen's association" (ECF No. 16-5, PageID.308), the Court will also use that term.

Jose Reyes and Sarah Jones, along with Bobby Reyes and their other four children, lived in Ash Township. (ECF No. 16-2, PageID.164–165.) Their home was close to the Ready Road Station. (*See id.* at PageID.205.) At one point, someone at town hall told Jones that emergency medical services were available at the Ready Road Station "24/7." (*Id.* at PageID.184, 198.) Indeed, Jones recalls, "the ambulances, they [would] wake us up at night." (*Id.* at PageID.198; *see also id.* at PageID.184.) But in fact—and unknown to Jones—Ash Township only had a volunteer fire

3

department, which meant that the station was not always staffed. (ECF No. 16-2, PageID.203; ECF No. 16-4, PageID.254.)

Bobby Reyes had a history of asthma. (*See* ECF No. 16-1, PageID.145; ECF No. 16-2, PageID.184.) At one point, he had been prescribed a nebulizer, but he never needed to use it. (ECF No. 16-2, PageID.185.) Instead, Reyes' inhaler sufficed to keep his asthma under control. (*Id.* at PageID.187.)

On September 21, 2019, around 9:45 at night, Reyes had an asthma attack. (ECF No. 16-2, PageID.201.) But this time, his inhaler provided no relief. (*Id.* at PageID.207.) And the nebulizer could not be quickly located—after all, Reyes had never needed it. (*Id.* at PageID.186, 206.) Jones, recalling that she lived near the Ready Road Station and believing it was staffed with emergency medical services 24-hours a day, decided to bring her 14-year-old son there. (*Id.* at PageID.205.) She recalls telling Reyes, "[G]et in the car, . . . we'll take you to the ambulance, we'll get there before they can even leave." (*Id.* at PageID.203.) As they left the house, Jones called 9-1-1. (*Id.* at PageID.201.)

The 9-1-1 call could have been answered by any of four dispatchers working the four dispatch desks that night. (ECF No. 19-3, PageID.379, 381.) One desk was for dispatching city police (and, possibly, other city services). (ECF No. 19-3, PageID.379.) A second desk, staffed by Chrissy Miller, was for dispatching the county sheriff (and, possibly, other county services). (ECF No. 19-3, PageID.381.) The third desk was for fire services; David Nagy was working that desk that night. (ECF No. 19-3, PageID.379; *see also* ECF No. 16-5, PageID.305.) A fourth desk was a law-

enforcement-information-network desk; Sonya Sampsel was working the LEIN desk that night. (ECF No. 19-3, PageID.379) "All desks are responsible for answering 9-1-1 calls as well as non-emergency calls." (ECF No. 19-3, PageID.379.)

Sampsel answered Jones' 9-1-1 call. The call was recorded, but there is a "toned out" part at the very beginning of the recording. And Jones says that during this part, "I tell [Sampsel] I'm driving down Ready Road to the firehouse." (ECF No. 16-2, PageID.208; *see also* ECF No. 16-2, PageID.201.) After the tone, Jones and Sampsel, with great urgency in their voices, can be heard having this exchange:

| | | |
|---|---|---|
| Jones: | | "I'm at Ash fire station, my son, my son can't breathe! I need help— |
| Sampsel: | | "What's the address?" |
| Jones: | | "I'm at Ash Township, at the fire station. He's on the ground—" |
| Sampsel: | | "Hold on, hold on, ma'am I can hardly hear you, where are you at?" |
| Jones: | | "I'm at Ash. Township. Fire Department." |
| Sampsel: | | "You're at Ash Township Fire?" |
| Jones: | | (Pause.) Yep. And my son is on the ground, and he can't breathe!" |

(ECF No. 16-3 at 9:54:53 p.m. to 9:55:16 p.m.)

In the dispatch computer system, Sampsel entered information from Jones' call. The system's log reflects, "Caller Statement: Obviously NOT BREATHING & Unconscious." (ECF No. 16-5, PageID.305.) Sampsel also entered a dispatch code with a "Response" of "EMS 1 / Fire 1." (*Id.*) According to Sampsel, this caused something to pop up on Nagy's screen at the fire desk, and Nagy was then responsible for dispatching an ambulance, a fire truck, or both. (ECF No. 19-3, PageID.379, 386, 388.)

5

Sampsel also entered the following location in the system: "ASH TOWNSHIP FIREMENS ASSOCIATION, Venue: CARLETON." (ECF No. 16-5, PageID.306.)

Seeing the information entered by Sampsel on their monitors, both Miller (county desk) and Nagy (fire desk) began radioing responders. Miller stated over the radio, "Respond to Ash Township Fire Station 1-2-8-7-5 Horan, twelve eight seventy-five Horan, with a cross of Ash." (ECF No. 16-3 at 9:56:12.) And about 40 seconds later, Nagy stated over the radio, "Central, Ash Fire, Priority 1: Ash Township Fireman's Association Park, 1-2-8-7-5 Horan Street, 1-2-8-7-5 Horan Street, cross of Ash street. 14 year old child. CPR in progress. Priority 1." (ECF No. 16-3 at 9:56:52.)

Meanwhile, Sampsel was busy helping Jones. Over the next few minutes, Sampsel coached Jones through CPR and tried to calm Jones down because she was, very understandably, extremely distressed. (*See* ECF No. 16-3 at 9:55:31 to 9:59.) As their call continued, Jones wondered why her 9-1-1 call did not prompt those inside the Ready Road Station to simply open the doors and come out to Reyes. At one point Jones told Sampsel, "Just ask them to come outside." (*Id.* at 9:55:38.) And at another point, Jones exclaimed, "I'm right here at the fire station, why can't they hear me?" (*Id.* at 9:56:15.) Sampsel replied, "I'm sending them there to help you now . . . ." (*Id.* at 9:56:17.) At about 9:57 p.m. (about two minutes after Jones had dialed 9-1-1), Jones, with coaching from Sampsel, began performing CPR on Reyes. While Jones performed CPR, Sampsel told Jones several times that "they're on the way" or "everyone's on their way." (*Id.* at 9:57:35, 9:57:56, 9:58:14.)

6

Although firefighters were on the way, that was not because they had been dispatched to the correct location. When taking Jones' call, Sampsel had entered the Ash Township *firemen's association* on Horan Street into the dispatch system. (ECF No. 16-5, PageID.306.) But Jones and Reyes were at the Ash Township *fire station* on Ready Road. Indeed, at about 10:01 p.m. (about six minutes after Jones dialed 9-1-1), a Monroe County Sheriff's deputy and an Ash Township fire truck arrived at the firemen's association. The deputy radioed, "I'm out at the location, I don't see the lady" (ECF No. 16-3 at 10:01:02), and the fire truck radioed, "can you give us a better location, cause there is no one in the township—the association" (ECF No. 16-3 at 10:01:21).

Despite the fact that Sampsel had entered the wrong location into the dispatch system, two firefighters were, fortuitously, on their way to Reyes. Terry Daniels, an Ash Township firefighter, was at home when he received notice of Jones' 9-1-1 call. Following protocol, he first went to the Ready Road Station to grab his gear before heading out to the (incorrect) dispatched location. (ECF No. 16-4, PageID.260–262, 264.) And when he got to the Ready Road Station, Daniels unexpectedly saw Jones and Reyes. (ECF No. 16-4, PageID.264–265.) He quickly went inside the station to grab gear and a radio and then came out to help Reyes. (*Id.* at PageID.265.) And so about 30 seconds after those at the firemen's association had radioed that they could not locate Jones, Daniels clarified over the radio: "Our patient is down in front of Station 2, please respond to Ready Road and Sweitzer." (ECF No. 16-3 at 10:01:49; *see also* ECF No. 16-4, PageID.267.)

7

With that information from Daniels, Nagy and Sampsel updated the dispatch system. Around 10:02 p.m. (about eight minutes after Jones dialed 9-1-1), Nagy updated the location to "READY / SWEITZER RD," and about a minute later, Sampsel refined the address in the system to "1677 READY RD, Venue: ASH TWP." (ECF No. 16-5, PageID.307.)

And around this time, at 10:03 p.m., an ambulance was finally dispatched. (ECF No. 19-8, PageID.471.) The ambulance was dispatched to the correct address: the Ready Road Station. (*Id.*)

Meanwhile, Daniels was trying to save Reyes. He had taken over CPR from Jones. (ECF No. 16-4, PageID.268.) Soon, another firefighter, Steve Eyler, arrived at the Ready Road Station. (ECF No. 16-4, PageID.271.) Like Daniels, Eyler had come to the station to get his gear before heading out to the dispatch location. (*See* ECF No. 16-4, PageID.277.) Eyler grabbed a bag valve mask and oxygen and assisted Daniels. (ECF No. 16-4, PageID.271–272.) Despite the two firefighter's efforts, Daniels and Eyler were not able to get Reyes' breathing again. (ECF No. 16-4, PageID.274–275.) Nor could they get his heart to restart. (*Id.*)

By 10:05 p.m. (about 10 minutes after Jones dialed 9-1-1), an Ash Township fire truck arrived on scene. (ECF No. 16-3 at 10:05:56; ECF No. 16-5, PageID.307 (indicating "Unit F26" at scene at 10:04:27); ECF No. 16-4, PageID.270.) A few minutes later, another Ash Township fire truck arrived. (ECF No. 16-3 at 10:09:22.) At least one police officer was there too. (ECF No. 16-5, PageID.307 (indicating "Unit 404" at scene); ECF No. 19-3, PageID.378.)

8

But the ambulance from Monroe Community would not get to Reyes until 10:11 p.m. (ECF No. 19-8, PageID.471; *see also* ECF No. 16-3 at 10:08:07 (indicating ambulance was en route and at I-275 and Telegraph).) This was 16 or so minutes after Jones had dialed 9-1-1 and around 25 minutes after the start of Reyes' asthma attack. After 20 more minutes, using medicine and equipment that the firefighters did not have, ambulance personnel were able to get Reyes' heart to restart. (ECF No. 16-4, PageID.278; ECF No. 19-8, PageID.473.)

But Reyes had suffered severe brain damage by this point. In October 2019, weeks after his asthma attack, Reyes was taken off life support. (*See* ECF No. 16-2, PageID.168.)

B.

About nine months after Reyes' death, Jones and Reyes' father, Jose Reyes, filed this lawsuit. (ECF No. 1.)

As filed, Plaintiffs' complaint contained five counts. But in their summary-judgment response brief, Plaintiffs have agreed to dismiss two counts: their sole claim against Monroe County and a claim that Sampsel intentionally inflicted emotional distress. (ECF No. 19, PageID.342–343.)

So as things now stand, there are three counts left, all against Sampsel. Plaintiffs claim Sampsel violated the Due Process Clause of the federal Constitution, was negligent, and negligently inflicted emotional distress. (ECF No. 1, PageID.8, 14, 17.)

Sampsel now asks this Court to grant her summary judgment under Federal Rule of Civil Procedure 56.

## II.

Under Federal Rule of Civil Procedure 56, this Court is tasked with deciding "whether there is the need for a trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). If no reasonable jury could find Sampsel liable even if it fully accepted Plaintiffs' version of the facts, then a jury trial is not necessary, and Sampsel is entitled to summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Anderson*, 477 U.S. at 250–52.

## III.

The Court begins with Plaintiffs' federal claim, and then turns to their two state-law claims.

### A.

The Fourteenth Amendment to the Constitution prohibits a state official like Sampsel from depriving a private citizen like Reyes of his "life" "without due process of law." Although "due process of law" certainly includes procedural protections, it also has a substantive component. And here, Plaintiffs have advanced "a 'state-created-danger theory' of substantive due process." *Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 932 (6th Cir. 2020).

Before analyzing the merits of Plaintiffs' state-created-danger claim, the Court pauses to note that this case is not like other cases where this theory is usually advanced. *See Estate of Romain v. City of Grosse Pointe Farms*, 935 F.3d 485, 491 (6th Cir. 2019) ("The state-created danger doctrine allows plaintiffs to bring due

process claims under § 1983 for harms caused by private actors—an anomaly because neither the Fourteenth Amendment nor § 1983 regulates private actors."). Indeed, all three cases that Plaintiffs discuss at length involve state actors failing to protect one private citizen (e.g., a child) from another private citizen (e.g., an abusive parent). *See Lipman v. Budish*, 974 F.3d 726, 731 (6th Cir. 2020); *Engler v. Arnold*, 862 F.3d 571, 573 (6th Cir. 2017); *Smith v. City of Elyria*, 857 F. Supp. 1203, 1210 (N.D. Ohio 1994). But here, asthma, not a private citizen, was the threat to Reyes.

That said, Sampsel has not argued that the state-created-danger theory cannot be applied to Reyes' situation. And because the Court ultimately finds for Sampsel, the Court will assume in Plaintiffs' favor that the theory extends to situations where the source of the harm is not another private citizen.

To prevail on a state-created-danger claim, Plaintiffs must show, among other things, that Sampsel's conduct "shock[ed] the contemporary conscience." *Doe v. Jackson Local Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 933 (6th Cir. 2020). "On one end" of the culpability spectrum, "negligent conduct will never shock society's conscience." *Id.* at 933 (internal quotation marks omitted). On the other end, "conduct unjustifiably intended to injure is the most likely to rise to the conscience-shocking level." *Id.* (internal quotation marks omitted). Between these two poles, the line separating liability from no liability depends on the facts of the case. *See id.* In other words, "the middle states of culpability, such as recklessness, gross negligence, or deliberate indifference, may or may not be shocking depending on context." *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 535 (6th Cir. 2008).

11

But even when considering conduct in the middle, there are guideposts. The one that is most relevant here is whether the state actor had time to deliberate or was forced to make a hurried decision. *See Hunt*, 542 F.3d 529 at 541; *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002). In cases where a state actor was forced to make a quick decision, courts have required a plaintiff to show that the state actor intended to cause harm to establish liability under the Due Process Clause. *See County of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998) (providing that "when unforeseen circumstances demand an officer's instant judgment," even the officer's reckless conduct will not shock the conscious); *Jackson Board of Education*, 954 F.3d at 933 ("[The Supreme Court] has added that an actual intent to injure is required when public actors must make hasty decisions, such as during a high-speed chase or a prison riot."). An intent-to-harm standard makes sense when there is no time to deliberate; after all, "the [deliberate indifference] standard is sensibly employed only when actual deliberation is practical." *Lewis*, 523 U.S. at 851.

Here, Sampsel had virtually no time to deliberate. Jones told Sampsel, "my son can't breathe." Sampsel had to act—and quickly. Thus, for Sampsel to be liable under a state-created-danger theory, it appears that Plaintiffs must show that she acted with intent to harm Reyes. And if that is the requisite standard, not a shred of evidence supports holding Sampsel liable under the Due Process Clause. Sampsel did not intend to harm Reyes; she intended to help Reyes.

But, for the sake of argument, the Court will assume that Plaintiffs' burden is something less: deliberate indifference. Under this culpability standard, it must have

12

been the case that Sampsel inferred from Jones' call "that a substantial risk of serious harm exist[ed]." *Jackson Board of Education*, 954 F.3d at 933. And even if she understood that Reyes was at high risk of grave harm, Sampsel is only liable if she responded "in a manner demonstrating 'reckless or callous indifference' toward [Reyes'] rights." *Id.* Here, no reasonable jury could find that Sampsel was indifferent to whether Reyes lived or died.

There is no dispute that Sampsel made a mistake. Sampsel explains that when she attempted to enter Reyes' location into the dispatch system, she typed something like "Ash Township" or "Ash Township Fire" and was then presented with a "dropdown list"; this dropdown list "likely" included the Ash Township firemen's association and both Ash Township fire stations. (ECF No. 19-3, PageID.380.) Sampsel does not remember why she picked the association from the list. (ECF No. 19-3, PageID.381.) And Sampsel's selection seems even more questionable given Jones' testimony that during the tone-out portion of the call, "I tell [Sampsel] I'm driving down Ready Road to the firehouse." (ECF No. 16-2, PageID.208; *see also* ECF No. 16-2, PageID.201.) After all, the firemen's association was on Horan Street, not on Ready Road. And even if Sampsel did not hear Jones say, "Ready Road," had Sampsel followed protocol, she might still have selected the correct location from the list. Sampsel later explained that she had been trained to obtain cross streets and that she received a written reprimand for failing to do so during Jones' 9-1-1 call. (ECF No. 19-3, PageID.384, 387.)

13

But even assuming that evidence could be characterized as indifference, it does not stand alone, and there is considerable evidence showing that Sampsel was not indifferent to Reyes' life. First, even if Jones told Sampsel "Ready Road" at the very start of the call, the recording suggests that Sampsel did not simply choose to ignore that information. Instead, the recording suggests that Sampsel either did not hear Jones or did not internalize that information:

| | |
|---|---|
| Jones: | "I'm at Ash fire station, my son, my son can't breathe! I need help— |
| Sampsel: | "*What's the address?*" |
| Jones: | "I'm at Ash Township, at the fire station. He's on the ground—" |
| Sampsel: | "Hold on, hold on, ma'am *I can hardly hear you, where are you at?*" |
| Jones: | "I'm at Ash. Township. Fire Department." |
| Sampsel: | "You're at *Ash Township Fire*?" |
| Jones: | (Pause.) Yep. And my son is on the ground, and he can't breathe!" |

(ECF No. 16-3 at 9:54:53 to 9:55:16 (emphasis added).) Second, as this excerpt of the call also shows, far from being indifferent to Reyes' location, Sampsel made repeated efforts to obtain the correct location. Third, Sampsel knew that time was of the essence: Jones had said that Reyes was not breathing. Indeed, Sampsel likely needed to move on from collecting location information to gather other information about the situation (e.g., whether Jones knew CPR). So while Sampsel perhaps should have doubled back for cross streets or a street number after she saw the dropdown list of three locations in the system, she had already made multiple efforts to obtain Reyes' location, needed to immediately dispatch rescuers, and needed to gather other

14

information to help Jones help Reyes. As such, no reasonable jury could find that Sampsel was indifferent to whether Reyes lived or died when she selected the firemen's association from the list. *See Hunt*, 542 F.3d at 540 ("The need to act in haste is itself a governmental purpose that can justify executive actions that, if made at leisure, might appear irrational or arbitrary."); *see also See Johnson v. City of Phila.*, 975 F.3d 394, 401–02 (3d Cir. 2020) (finding 9-1-1 operator did not act with deliberate indifference despite that operator directed family to remain inside a burning building but failed to relay the family's location to firefighters).

That would be the end of the matter, but Plaintiffs make two other points worth expressly addressing.

For one, they point out that Sampsel repeatedly told Jones that help was "on the way" and "everyone's on their way." According to Plaintiffs, Sampsel's assurances caused Jones to stay at the station. (ECF No. 19, PageID.334.) Plaintiffs say that had Sampsel not made those assurances, Jones "could have taken other actions." (*Id.*)

Even ignoring the factual difficulties with this theory (i.e., it is entirely unclear that Jones would have taken "other actions" had Sampsel just been silent or that the "other actions" would have saved Reyes), it remains that the requisite culpability under the Due Process Clause is lacking. The reason Sampsel assured Jones that help was on the way was because Sampsel believed that help was on the way. And the reason Sampsel believed that help was on the way is the very same reason she selected the firemen's association from the dropdown list. In other words, Sampsel had the same state of mind when she selected the association in the dispatch system

15

as when she assured Jones that help was on the way. So for the same reasons that no reasonable jury could find that Sampsel acted with "reckless or callous indifference" toward Reyes' life when she selected the association from the list, no reasonable jury could find she acted with reckless or callous indifference to Reyes' life when she told Jones that help was coming.

Plaintiffs also fault Sampsel for dispatching only fire and police initially. They point out that an ambulance was not dispatched until about 10:03 p.m.—about eight or nine minutes after Jones had dialed 9-1-1. (*See* ECF No. 19, PageID.326, 335.) And Plaintiffs point out that only the ambulance staff (as opposed to fire or police) were able to get Reyes' heart to restart. (ECF No. 19, PageID.326.)

This argument lacks evidentiary support. The log from the dispatch system shows that Sampsel entered "EMS 1 / Fire 1" at 9:56 p.m., i.e., within a minute of answering Jones' call, Sampsel indicated emergency medical services or fire should be dispatched with "priority one." (ECF No. 16-5, PageID.306; *see also* ECF No. 19-3, PageID.379.) Further, Sampsel's unrebutted testimony was that after she entered "EMS 1 / Fire 1" into the system, Nagy received a notice on his monitor and that Nagy was responsible for dispatching ambulance or fire (or both). (ECF No. 19-3, PageID.379 (describing a "pop up" on Nagy's screen and explaining that "[Nagy] is responsible for just dispatching the fire and ambulance to all medical or fire related calls"); *see also* ECF No. 19-3, PageID.383 ("It automatically brings [fire and ambulance] up on the fire desk screen.").) The audio from the 9-1-1 call also reveals that Sampsel was trying to gather other information from Jones and provide Jones

16

with CPR instruction. If there was a delay in dispatching the ambulance, that delay was not Sampsel's fault. (*See* ECF No. 19-3, PageID.382 ("[L]ooks like Dave [Nagy] probably called the ambulance after dispatching fire.").)

In all, "[Sampsel's] conduct violates the Due Process Clause only if it is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Jackson Board of Education*, 954 F.3d at 933. No reasonable jury could find that Sampsel's handling of Jones' 9-1-1 call fits that description.

B.

That leaves Plaintiffs' assertion that Sampsel violated state law. Plaintiffs have two state-law claims that remain in this case: negligence and negligent infliction of emotional distress. Sampsel claims she is shielded from these two claims by Michigan's Governmental Tort Liability Act.

Under that Act, Sampsel "is immune" from torts sounding in negligence—including both of those that Plaintiffs advance here—if she was acting in the scope of her authority, she was performing a government function, and her conduct did not amount to "gross negligence" that was the proximate cause of Reyes' and Jones' injuries. Mich. Comp. Laws § 691.1407(2); *Brent v. Wayne Cty. Dep't of Hum. Servs.*, 901 F.3d 656, 688 (6th Cir. 2018).

In turn, "gross negligence" "means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws § 691.1407(8)(a). According to the Michigan Court of Appeals, "gross negligence" "suggests . . . almost a willful disregard of precautions or measures to attend to safety

and a singular disregard for substantial risks." *Tarlea v. Crabtree*, 687 N.W.2d 333, 339 (Mich. Ct. App. 2004); *accord Bellinger by Bellinger v. Kram,* 904 N.W.2d 870, 873 (Mich. Ct. App. 2017). "It is as though, if an objective observer watched the actor, he could conclude, reasonably, that the actor simply did not care about the safety or welfare of those in his charge." *Tarlea*, N.W.2d 333 at 339–40.

If that culpability standard sounds familiar, it should. For purposes of this case at least, Michigan's gross-negligence standard is similar enough to the deliberate-indifference standard the Court applied in addressing Plaintiffs' federal claim. So for all the reasons that Sampsel is not liable under the Due Process Clause of the federal Constitution, Sampsel is also not liable under state law.

IV.

Although Bobby Reyes' death is "heart-wrenching," *Jackson Board of Education*, 954 F.3d at 928, in this case, the law cannot provide redress to the grieving survivors. Sonya Sampsel was not reckless in handling Jones' 9-1-1 call. So no reasonable jury could hold her liable. And, as stated, Plaintiffs have "waived [their] *Monell* claim" against Monroe County. (ECF No. 19, PageID.342.) Accordingly, a judgment in favor of Defendants will issue.

SO ORDERED.

Dated: November 15, 2021

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE